I'm going to apologize in advance. I'm just getting over a cough. I trust it won't interfere with the argument today. We're going to try to reserve 5 minutes for rebuttal. I'd like to focus on several points. First, of course, I will address the Jones case, as this panel requested. Then I would like to focus on, first, the fact that the Court erred in concluding that repeated use of racial epithets such as the word nigger, black ass, use of the Nazi salute and other white supremacist language was not sufficiently severe or pervasive to constitute a hostile work environment. And I apologize in advance for using the terms, but I think it's important that they be used in court. Second, the Court erred in excluding evidence that did not have overt racial connotations to it, because the Supreme Court and this Court have held that the test is whether or not members of one sex or race are exposed to disadvantageous terms and conditions of employment that members of another race or sex are not exposed to. It need not have an overt racial component if the facts can show that one sex or race is, in fact, treated differently. Third, it erred in finding no continuing violation on these facts. The Court, although actually held that plaintiffs must show that a violation exists in the statutory period, and that's clear error, as this Court and the Supreme Court now has held. The Court also erred in holding that the acts were not sufficiently related. And finally, as regards to Appellant Perez, the Court erred in concluding that the appellees took sufficient remedial steps, because here I think it's important to note the memo that was sent out regarding the graffiti did not even make reference to the fact that it had any racial connotations. And so the employer never even submitted to all of its employees a message. What did Lucky do with respect to the graffiti, and what, in your view, should it have done? What Lucky did was it suspended the person that was potentially thought to be responsible for some of it pending the investigation. And it sent out a letter that simply said that there was some graffiti that mentioned Mr. Perez's name. It did not say anything about racial graffiti. If it excerpts of record 589, it simply said, will you please inspect your receiving area, and it would be greatly appreciated if you would find it, if you would have it removed. It does not say we have a policy against racial discrimination or harassment. It did not say you need to inspect on a regular basis and ensure that the graffiti be removed. They did not, in fact, ensure that the bathrooms and receiving areas were inspected and to make sure. I have a couple of questions. How long? This person got a substantial amount of time off, right? He got three weeks off. All right. Which, without pay, right? Correct. Okay. And this happened exactly what year was this? This was in 98, February of 98. Well, part of the, you know, I have a few areas that I would sort of like you to address, and I'll try to just tell you where my concerns are. First off, there's some evidence here that I know that you're saying should have come in that didn't come in. And so it's important, obviously, when we evaluate, you know, whatever we decide is left and was properly admissible, that's where we're going to determine if, you know, if there's a tribal issue on hostile work environment. I have a problem with there was statement that there were other people that had had, you know, racial remarks made to them. But it was a hearsay type of thing. There were not affidavits from that person. And I think the court below said, you know, that doesn't come in because you didn't, you know, you didn't get I would be inclined to agree that that part wouldn't come in. And there's a whole, there's another area, too, that I know that you explore in terms of you said that the Caucasian people got different breaks than African American people. All right. And you state that conclusion in a conclusionary fashion, which I would agree that would be enough if, say, you were looking at a 12B challenge. But this is summary judgment. What evidence is there other than that conclusion that people were treated disparately for their breaks? So, I mean, those two areas, if you take those out, then I have to look at what you have left. And then there's also, too, employment law has been a really evolving area for people that are involved in that. I think know better, I'm sure that both counsel know that better than anyone else. And in terms of what would be an adequate response, do we evaluate that in terms of what the law was at that time? Or can you bootstrap it and, you know, take it to 2005 and say, well, yeah, maybe what you did was good enough in 98. But by 2005 standards, that's not. Well, on several different issues, yes. I know that's a lot of things. But those are areas of concern that I have when I'm evaluating what I think you have left, you know, what I'm going to be looking at to say, you know, what's your, you know, what have you presented and what are we looking at? Sure. With respect to the three different appellants, there were different affidavits that were submitted on behalf of different people. So with respect to Aubyn Merritt, for example, he submitted affidavits from Darnell Smallwood, from Don Page, from Charles Hayes, and from another, Tim Muldrow, who all testified about what they observed. And Mr. Merritt said that they informed him of certain things. So there is some third-party testimony as to some of the appellants. We're not striking. That's not what I was talking about in terms of striking. There was some allegation that there were other people that had, I think the judge said the graffiti. With respect to Perez? I'm trying to remember what it was, but I remember that there weren't affidavits from the actual people. With respect to Mitchell, I thought it was, but I'm not sure. With respect to Perez, it's true that there were third-party affidavits. And we would submit, and he did say that he was told by other truckers that there was more graffiti. We would say that even if you just look at the 20 or more incidents that he personally observed, that that constitutes a severe and pervasive hostile work environment because the nature of the graffiti was so gross and severe and threatening. It did use the term nigger, beaner. These are terms that are not mere offensive utterances but have been held to be very severe. Hold on. The word beaner, I gather, means either Mexican-American or Hispanic or something like that. That's correct, Your Honor. I've lived on this globe now for 70-some odd years, 73. I never heard the term before, and when I read it, I couldn't figure it out. I went to my two law clerks. Neither one of them knew what it meant. So, you know, you're saying, oh, this is terrible and so on and so forth. I never heard of it before. I assume that means, well, I guessed. Am I correct? Yes, that is correct, Your Honor. That's what your contention is. All right. For Mexican-Americans. And again, I would... So that you're suggesting then that something which might be offensive can change from place to place. Is that correct? Well, certainly the Court has held that it has to be looked upon by a reasonable person of the same ethnicity as the person who is the recipient of it. Fine. I know lots of Hispanics in New York. They wouldn't know what the heck we were talking about. Secondly, it does have to be considered by the totality of the circumstances. Thirdly, a lot of the graffiti specifically said pure white, all right. There was clear no nigs, no beaners. There was a clear, by the way that it was framed with these other terms, it was clear that it was a racial epithet and that it was meant to be exclusionary and in conjunction with the other language clearly had that connotation to Mr. Perez. The second issue I wanted to address, anyway, so for the 20 incidents that he saw, these are clearly sufficient to be severe pervasive because they happened in a very short period of time. It was about a year. And after the memo... But in that situation, it's also about, because this is a fairly big business, right, and that, and obviously for the employer to be responsible, it, we have to take into consideration the response to it, right? The response was really fairly minimal. I mean, this I think even by 98 standards was not sufficient because they, after they suspended this person, they didn't ever tell him, you know, we're not going to permit racial epithets or anything else. The graffiti got worse. He actually saw more graffiti after they took this so-called response. They did not have trainings. They did not send out a memo to everybody saying that this should not be permitted. The memo only went out to store managers. It only mentioned that graffiti that mentioned Ralph Perez should be painted over. It was not painted over effectively. The words still bled through. More graffiti proliferated that said Ralph P. rats out. Ralph to be afraid. He actually was threatened as far as the man who was suspended said, this isn't  You know, I know how to get back at you. So...  Do you contend that it wasn't painted over quickly enough? It wasn't painted over quickly enough as well as wasn't painted over effectively and they did not ensure that more graffiti didn't spring up. They didn't do anything to really ensure that no more graffiti sprang up. And McGinnis is a new case that supports you. Correct. That wasn't on the books at the time the district judge was dealing with the case. That's correct, but... That raises Judge Callahan's question. Do you get the benefit of that, Anne Donnelly and the Amtrak case? Yes. The Federal courts have clearly spoken that when a Federal case comes down, it is retroactive. The Harper case, which I have cited as a U.S. Supreme Court case, 509 U.S. 86 at page 96, really clarified that when the court speaks, it's as to a rule of Federal law, that rule is the controlling interpretation of Federal law and must be given full retroactive effect, in all cases still open on directive view, and as to all events, regardless of whether the events predate or postdate our announcement of the rule. So Federal cases do become, in general, retroactive. If a new statute is applied, then there could be a question as to whether or not that would be retroactive, and the general rule is that it wouldn't be. But with respect to Federal opinions, they are. McGinnis also isn't really a new rule of law. It's a new application of the law. It clarified what was existing in a very concrete way because of the fact that it had so many events that were similar to the events that occurred in this case, including the graffiti. But it really was not a new rule of law. It was just the clarification in a very, very similar set of facts. As to the issue about whether or not some of the conclusions about whether or not treatment of whites and blacks were different, again, the declarations have specifics when they can recall them. So tell me what those are, because they don't say, well, so-and-so got a 20-minute break and so-and-so got a 30-minute break or so. Sure. In one in the Declaration of Robin Merit at 2344, paragraph 18, he specifically says in about 96, he noticed Jesse Rickey, a white supervisor, would allow white employees to stop and talk but would tell an African-American employee to keep moving in the 1990s. And he states a statement that he heard by an African-American employee. In the 1990s, he heard and observed Danny McNeil, a white employee, walk over to Dave Blue, a supervisor, and state, what are those guys doing over there, in reference to a group of African-American employees. And he says, again, since the early 80s, I've observed Nuber's incident of Lucky's management. And then he enumerates one, two, three, four, five different employees engaging in similar activity. There are other declarations by Mr. Hayes, and I believe Mr. Muldrow. That's very conclusionary to me. I mean, anyone could say that's just like saying the doctor was negligent. You know, I think the doctor was negligent. I think, you know, that doesn't really tell you, I mean, in the workplace, how can I know if someone, you know, why someone did something? It seems you've got to make a little more of a showing on that. It is hard. It's a credibility determination, ultimately, for the jury. There's a recent case that just came out on September 2nd. Don't you think it's, well, hold on. You said it's a credibility determination, whether you're talking in conclusionary words. It's not a credibility determination. That's for the district judge. I don't know what more detail in that particular instance could have been given. What I meant was that the two individuals, the supervisor and the employee, would both stand, get up on the stand and say, this is what I observed. This is what happened. The other person would say, no, I didn't do that. I don't remember that. I didn't do that. That's what I meant. There's a new case, EEOC v. NEA, which just came out on September 2nd, that makes it clear that direct comparative evidence about how the alleged harasser treated members of both sexes, in this case it was a sex harassment case, is an available evidentiary route to show sex harassment. It need not be overt sexual comments. You do have to have evidence relating to how one group of employees was treated relative to the other. But sometimes the only way to do that is to have two different people get up and testify about what they observed and how they saw people being treated. And ultimately, you know, our contention is that there would have to go to a jury to determine whether or not race was the reason or some other reason was the reason. The other incident that I can give you a specific example of is Mr. Merritt constantly had, with three different employees, troubles with his transporter being hit, his forklift being hit by their forklifts in ways that endangered him. And he testified very specifically about why he felt that those were not just accidents and that those same individuals had all made racial comments. So he testified about the reasons why he felt those were racially motivated. He also talked when he mentioned that his, the wheel on his forklift was sabotaged. He describes in his deposition that he was told by the engineer that the way the wheel came off. But see, I can't even, but that's more evidence than seeing someone tell those employees to stop talking. Or, I mean, there's just so many inferences that can come from that. But an accident when someone hits you and you put it with other circumstances, you know, that, to me, is more evidence than just saying, well, there's disparate treatment on breaks because I saw, you know, there were five, you know, the five white people got to talk. And then another time on another day, I mean, there could be so many things that would be going on. I mean, that's not, you know, that's not evidence like, well, I sat outside the break room and, you know, the white employees got to take 20 minutes break every day and the African-American employees only got 10. Right. There are other declarations with the declaration of Robin Merritt. I'm just trying to see which is the one that has another comment that specifically regards to the breaks. But a number of the different employees, including Calvin Mitchell, also observed the difference of treatment. And so you also have the fact that it's – and other people who are not plaintiffs in the case who all saw the same sort of conduct. It was very vague. Mr. Richardson, you said you wanted to reserve some time. If you'd like, if you want to look for that while you're sitting and you can come back and discuss it. Thank you. Time really flies when you're up here. Thank you, Your Honor. When you're having fun. Right. Thank you. Good morning. Good morning, Your Honors. I'm Lawrence Gartner for Defendants in American Stores and Lucky. First, let me address a question posed by the Court in terms of what is the impact of a later ruling such as the McGinnis case on behavior and actions of an employer that occurred or may have occurred years before. And I think as counsel conceded, the McGinnis case didn't really establish any new rules of law. The McGinnis case was simply a case which applied very existing rules of law to a very detailed set of facts. The concern is it creates kind of a guessing game for employers. I mean, do you guess in 1988, 1992, 1995, what a court of appeals view of the facts will be in 2004? Do you have any idea how a court of appeal will react in terms of whether you should cover up a graffiti in one week or in one day or in two weeks? They came forward with evidence that it was weeks between the time the graffiti was reported and the time it was painted over, and not painted over very well at that. Right? There was evidence. Some of the evidence from the appellants was some of it was covered over in days, if I believe. Some were weeks. I think there was one to two weeks in one portion of the testimony, two to three weeks in another portion. Why isn't a jury question raised about whether that was reasonable, a reasonable response to have racist graffiti hanging around for maybe up to a couple of weeks or longer? I think, Your Honor, at some point we have to say this is not a reasonable jury could not find harassment based upon this criteria. Because if the graffiti were covered up in three hours, couldn't we say the same thing? Why isn't that a jury question? Three hours and two weeks aren't the same thing. I mean, we have to take the facts most favorable to the plaintiff at this point. And that, you know, the language was offensive. No two ways about that. And it was more than one time. It's not just a stray remark. So the question is, give us your best argument on why what they did was enough. Because essentially we have to we've got to give them the benefit of, and that's what I was trying to with appellant or plaintiff, you know, hone down, you know, what exactly do I have left in this body of facts that I'm looking at to decide whether a jury, you know, whether there's a triable issue here? Mr. Perez does concede, so we can establish that, that all the graffiti was covered up. He's testified to that. There was some bleed through. He's testified the references to graffiti reappearing apparently was because whatever they used to cover it up before they put the stainless steel's walls on. But obviously, let's say you left it for six months, and it said Mr. Perez is a beaner, this, that, you know, all of, you know, and I'm using, I'm taking the same approach that we, you know, we've got to use what the language is. It's not, I wouldn't talk like this normally, but we've got to deal with the language we have before us so that you've got, you know, all of these offensive things. And they left it for six months, and he has to go to work every day with his name and, you know, racial epithets. I mean, is that, you know, shouldn't a jury be able to look at that? Certainly, I would not submit to the Court that a reasonable jury could not find that six months was an unreasonable period of time to leave graffiti up without covering it up, without some extraordinary circumstances. But there's nothing in the record, and that's, I go back to what the Court was saying before, there's nothing in the record to indicate that that period of time was unreasonable. I mean, there's an indication of, first of all, 200-some-odd stores. There's no evidence about how long it would take to do it. There's no evidence that. Wasn't that your burden? I mean, you didn't come forward with anything to say we have, we're too busy to paint it over because of a strike or some other problem. I mean, they came forward and say there's this racist graffiti. It's been on there for weeks. Lucky was slow in cleaning it up. And you never came back with anything to say, well, we had a problem. We couldn't clean it up any sooner. Well, there's always a concern for proffering that kind of evidence that you're creating a triable issue of fact. Well, that's, you do it, you fail to do it at your peril, though. I understand that, Your Honor. But my point is, at some point, the Court needs to make a determination that this is not unreasonable, that a reasonable jury could not find it such that. That brings me to my next question. I'm wondering why we shouldn't ask the district judge, send it back and ask him to reconsider the ruling in light of McGinnis, not tell him how to decide it, but give it another look in light of not only McGinnis, but also Amtrak and Jones and Donnelly. That certainly doesn't pose the issue, that doesn't address the issue of whether the McGinnis standards or what the Court advised in McGinnis should be properly applied to an analysis of facts that occurred in the early 90s, for example, whether the Court, unless that is, in fact, the question that this Court would ask the district court to address. Clearly, the district court did not have the benefit of McGinnis, as it did in not any case rendered by any of the court of appeals, either the Ninth Circuit or other circuits, after the decision was rendered. But the question still is, do you look at the behavior in terms of what the factual analysis, not the legal standards, because I think the legal standards, I agree, do apply when they are pronounced by the Court, but do you look at the factual analysis in terms of subsequent factual analysis, or do you look at the factual analysis in terms of what the state of the law was at the time these acts occurred? And I think it's the latter, and I don't think analyzing McGinnis really addresses that issue. In terms of the statute of limitations, I think our position would be is, regardless of the difference in law in terms of the statute of limitations, and there was a difference, that even looking at prior incidents coming within arguably a broader statute of limitations, there still is not a sufficient tribal issue of facts to present to the jury on any of these appellant's cases. And I do emphasize that they are different cases, there are different sets of facts, and each appellant doesn't stand in the shoes of the other appellants. But I think that would be our position. I certainly know that Judge Moreno, now Justice Moreno, certainly indicated in the one of the decisions, Mitchell, I believe, that regardless of even taking into consideration the actions beyond the statute of limitations, there wasn't sufficient evidence in his belief that a reasonable jury could find a violation. And that's... I want to ask you about the 1981 claim. Sure. What impact, if any, does the Supreme Court's decision in Jones v. Donnelly have on the 1981 claim? And did Merritt preserve his 1981 claim in the district court? The answer to the first question is, clearly, it expanded the statute of limitations to four years rather than one year. And clearly, I think it brings his case closer to that dividing line where there would be enough to go to a jury. I don't think we could say otherwise. Our position is, even going back the four years, there still is not enough evidence to create a triable issue of fact because of some of the incidents being not of evidentiary quality to be admissible, because some of the incidents are simply conclusory. Well, what is the... Since the complaint frames the issues, what does he say in his complaint about the 1981 claim? I think he... I believe he alleges that these occurred to him in violation of 1981. I mean, I'm not sure. He certainly alleged the 1981 claim. The statute of limitations was conceded by both sides based on the law at that time to be one year. Okay. But what do you have to show in a 1981 claim? Under the amended 1981, according to the Supreme Court, you have to show that you were discriminated against on the basis of race in terms of terms and conditions of your contractual relationship. Is there any contract in the record? Is that ever part of the record? I think the Supreme Court has indicated, if I am not incorrect, and I haven't, to give some more thought to that issue, but I think the Supreme Court has indicated that the employment relationship is a type of contract that comes within 1981 without a formal, written, or even verbal contract. As a practical matter, is there any difference between the 1981 and a Title VII? There is in terms of the continuing, in terms of the substance of it. Right. And if it's a race claim, at this point, I don't think there is, given the amendments to that. So it's a statute of limitations problem more than anything else? Is that? I think it's a statute of limitations issue. Now, I do submit, however, that the Morgan decision does not apply necessarily to 1981 in terms of a continuing violation, because Morgan was based, to some extent, on the language of Title VII. But it would be hard for me to stand before you and say that his 1981 claim did not expand to 40 years. I do think that the intent of Congress was to include, and that is clearly pretty much stated in the Donnelly decision, to include racial harassment as a 1981 claim. If I may address any other questions on Donnelly, Your Honor. If I may address the graffiti issue, and I think we've covered, to some extent, the timing issue, but I am a little troubled by that, because obviously, you know, we probably would all say one day would be, you know, a good time to cover up graffiti. One week, though. Would one week be enough to go to a jury? Would four days be enough to go to a jury? Those are very difficult decisions. And I think the focus of the case is essentially, even though, you know, you might have, you know, if you take the facts and given the most favorable inference to the plaintiff, we do as a matter of law essentially say, okay, that's not enough. You know, that, you know, the employer was adequate in their response or whatever. So we've got to take the facts that you think we have left here and tell us why, you know, why what they did was enough. Well, I think when you run a large supermarket chain, when you have reports of graffiti in a number of your stores, and again, two weeks was the outer limit in the testimony. I think there, I recall a mention of days versus a week as well. So I don't think we're talking about testimony that says it took two weeks to cover up all the graffiti. I think that is a reasonable response, particularly from an appellant like Mr. Perez, who said it was all covered up, who concedes that the graffiti was probably the work of one individual who had a dispute with him personally, because much of the graffiti was directed towards him personally. The company did, as Your Honor pointed out, suspend the individual. The company, and he was ultimately suspended without pay for three, approximately three weeks, which is a fairly serious penalty short of termination in the industrial setting. I don't think there's any evidence that this individual put any more graffiti up after his suspension. Mr. Richardson made the point that they didn't warn other employees not to do it or the warnings were kind of half-baked. Well, I guess under the circumstances where the employee says, look, I think there's this graffiti I'm complaining about. I think so-and-so did it. The company hires these handwriting experts to see if that's the case because they're intending to terminate him. When you have that individually focused problem, do you have to send out a memo to everybody saying don't put up graffiti? I mean, I think not. That's the implication of McGinnis, isn't it? I don't think so, Your Honor, because I don't think McGinnis on its facts was quite the same where you had a very specific individual pointed out who's responsible for the graffiti. You know, if in fact you have an individual who uses a term such as Beaner and you have one person who does that and you deal with that, do you have to put out a memo then saying don't use Beaner in the workplace? Of course, Luckey's had a general policy prohibiting harassment in the workplace, and unlike McGinnis, the policy of Luckey did indicate you would be disciplined for violating the policy. And unlike McGinnis, the Luckey policy- It's all in the record? Yes, it is, Your Honor. Okay.  Yes. There are all the policies, I believe, are in the record, Your Honor. And the policy, unlike McGinnis, also indicated here's how you can complain. So the specific objections that the McGinnis court had to the policy in that case do not exist with respect to the Luckey's policies. And I think we're – we can overdo that. I think if we're going to require employers every time something comes up to send out another memo, employees are going to get inundated by these memos and they're just going to ignore them. I mean, they're just going to get so many memos and so many pronouncements from the company that I think there's an effect where, in fact, you run counter to what you want to accomplish. Well, this is what McGinnis says. We have been clear that in order to be adequate, remedial actions must be designed future conduct by the harasser, but also by other potential harassers. Yes, Your Honor. Your Honor, I would submit to you that the fact that this individual got suspended without pay for three weeks probably was well known to his colleagues at the warehouse. I think the most effective action one can take, which Luckey's did take, was when there is an identifiable individual who violates that policy, it does take effective action. And I think under the circumstances, it was as effective as it could be, because that's the proof of the pudding. You can send out a memo. You can send out policies. That's all well and good. Well, am I understanding your best argument to be that this one person seemed to be the problem. Right. They disciplined this one person, and I'm not sure it would be appropriate to say we disciplined so-and-so for such-and-such, and therefore, I don't know that you could expose that. Well, there would be privacy concerns about it, Your Honor. Right. But is it Luckey's position, is your best argument that you really felt that there was one person that was causing the whole problem and that's how you addressed it? As far as I know in the record, that's the only person who there is any indication who was identified as being responsible for any graffiti. I don't recall, and if I'm mistaken, I apologize, but I don't recall any identification of any other employee who placed any kind of graffiti on the wall who was not disciplined. And clearly — But Counselor, Ms. Richardson said that after the guy McCoy, I think his name was, was disciplined, more graffiti came about. Well, I think — And she further stated that it was harsher and more offensive. If I recall my reading of the record at ER 462, what Mr. Perez indicated in his deposition was that apparently the old graffiti that he had complained about before had bled through, that is, was visible again with the whitewash or whatever they put on it. And you're saying that as far as the record is concerned, there is no mention whatsoever of new graffiti showing up? I think — I think there may be some reference to new graffiti, but I also think at 462, Mr. Perez clarified that he was referring to the old graffiti that was showing through. And if I'm mistaken, I apologize, but I am pretty confident at 462 that he testified that this was apparently the old graffiti or someone complained about it. Am I remembering correctly, this wasn't confined to just one store? That was about six stores, Your Honor, approximately six. Was it ever determined that the source of the graffiti was just one person, whoever that person may have been? No one — as far as I can see from the record, Your Honor, no one else was identified as the source of graffiti. But, I mean, did anyone ever say, without being able to pinpoint who the person is, this is all from the same person, whoever it is? Well, I think they had the handwriting experts. Was there testimony? Was there reporting evidence? You know, I don't recall, Your Honor. Some place I saw was inconclusive. Is that correct? Yes, Your Honor. Clearly, there was evidence that the reports were inconclusive. From my reading of the evidence, it may have been that one of the examiners said it was Mr. McCoy, and one of them said it wasn't Mr. McCoy. But I do recall that it was inconclusive, and I think that was the term used, Your Honor. If I may address very, very briefly the issue of the forklift, the harm, the wheel sabotaged, I do believe that based on the evidence presented, these are all conclusions. This does not present actual evidence. And I compare this to McGinnis. In McGinnis, there was the wheel incident, and the Court was very strong on the wheel incident. But if you look at McGinnis, from what the evidence was presented, there was evidence of he complained. There was evidence he went to another supervisor and showed the tires, and the supervisor said, yes, they're bald. There was evidence that a white employee about the same time had his tires changed. There was evidence that he crashed and he went into the hospital, that he had a neck problem, an injury. None of that evidence was presented before the Court or is in the record, as far as I can see, regarding any of these incidents, other than conclusory statements that this was harmful, endangered me, this was an accident, this wasn't an accident, it was intentional, and I thought the motive was race. I think those are simply just conclusionary items. And they're very important because the Supreme Court has basically said that while verbal statements certainly can constitute the harassing environment, the physical manifestations are essentially a bit more important. Thank you, Mr. Gartner. Thank you very much. Ms. Richardson, back to you. You've got about three minutes left. Okay. First, I just want to clarify that there was additional graffiti. That's at ER 1079-83. The investigation was inconclusive. He was not suspended because of the results of the finding of the ER. Well, so is your best argument, then, that even though one person was disciplined, that it's not conclusive, that there are inferences in this record that can be made that more than one person in more than one location that graffiti was showing up, and so that just disciplining one person would not be an adequate response? Well, particularly since the graffiti did not stop and since he was threatened and the graffiti did say, you know, be afraid, that sort of thing. If you look at the evidence of remediation, you look at that one memo which says just there's been some graffiti. It doesn't mention race. It doesn't say we have a policy against racial discrimination. And then you look at the declaration of Mr. Houck, who is their best effort at showing the policies that they have and the procedures and the audits and so forth, and all of the evidence that they have, that they do investigations, that they have a zero tolerance policy, that they have any kind of trainings, is all after this lawsuit was filed. His declaration is very quiet about when these trainings actually existed, when these audit programs actually went into effect. And I'm looking at pages 408 through 411. And then if you look at the actual policies, they're all dated 1998. So they finally send out a memo after this lawsuit was filed, that's ER-423, saying the lawsuit's been filed, we want to reiterate our policy against racial discrimination. That's the first time they mention it to anybody. They simply under any analysis, pre-McGinnis, post-McGinnis, the remediation efforts in this case were just nonexistent. The conduct didn't stop. It continued. I wanted to quickly address the 1981 claim. The courts have held that a hostile work environment claim under 1981 is analyzed the same as the Title VII standards. So I would argue that the continuing violations should apply to both. Both Plaintiffs Mitchell and Plaintiffs Merritt had a 1981 claim. But did they preserve this claim? I didn't see much of anything in there about it. It was briefly mentioned, but they did preserve it. It was clearly identified by the defendants in their opposing brief about the pre-statute supplementations. The complaint does have allegations regarding incorporating by reference all paragraphs, which includes a paragraph that says a hostile work environment exists at the Lucky's stores. So they preserved it. There just was so much evidence to talk about that the focus of the briefs was the specific statutes at issue. So I think the concession has been made that 4 years would apply. And then we would argue that, in addition, you look at Morgan and see if acts outside the statute are also included in one continuing active hostile work environment. Thank you, Ms. Richardson. Thank you. This is a very well-argued case. Thank you to both counsel. The matter is submitted at this time. Good morning.
judges: Silverman, Callahan, Duffy